TREVATHAN *v.* TAYLOR.

Opinion delivered June 4, 1928.

*Davis & Costen,* for appellant.
*S. H. Mann,* for appellee.

MEHAFFY, J. Beginning about 1916, the appellant, a farmer, owned certain lands in Crittenden County, Arkansas, described in plaintiff's complaint, and was doing business with the bank in Crittenden County. He owed the bank considerable money, and executed a deed of trust to secure the payment of his indebtedness to the bank, and from year to year would give mortgages on personal property, including crops. He was unable to pay the indebtedness to the bank, and, some time in 1924, a suit was brought in the chancery court to foreclose the mort-

gage or deed of trust. The complaint was filed, and summons was served on the appellant. Shortly after the summons was served on appellant, he went to see the officials of the bank, talked to the cashier, who was in charge, and the cashier told him to forget about the foreclosure, and to go right ahead and they would give him a chance to pay it out. He would go right ahead farming just as he had been doing.

The appellant himself testifies that the cashier told him, when he asked him about the mortgage foreclosure, to forget it. The appellant testified: "I asked Mr. Rhodes, the cashier, what he was going to do about it. He said to forget it, and carry my business on as usual. My understanding and impression was that the foreclosure was not to be carried out." But, whether it was or was not to be carried out, both parties agree that Mr. Trevathan was to carry on his business as usual, and the preponderance of the testimony shows that the bank arranged with Mr. Trevathan that he should go right on with his business and make his chattel mortgages yearly as usual. He was not to pay any rent, and did not pay any for two years, and the bank was to give him a chance to pay the indebtedness.

The foreclosure suit and the agreement were really one transaction. Mr. Trevathan relied on the bank giving him a chance to pay it out, and, according to his testimony, he understood that there would be no further procedure in the foreclosure suit. But, whether that was true or not, both parties understood that Mr. Trevathan was to go ahead with his farming business as usual and try to pay the debt to the bank, and, if he did pay it, the land was to be his. According to this understanding, the sale was made, and, although the suit was to foreclose a debt for $16,000, the bank bid the land in for the entire indebtedness due it from Trevathan, and Trevathan kept the place, farmed it the two years, did not pay any rent, insured the place as usual, with a clause in the policy payable to the bank as its interest might appear, and in every way treated the property just as he did before the

foreclosure. He paid the taxes on it, and the bank also treated it as if there had been no foreclosure.

The testimony of the bank officials showed that it was the intention for Mr. Trevathan to pay the debt, and, if he could do that, he was to have the place. He was unable to pay the indebtedness, and in 1927 the bank brought a suit to foreclose on one of the notes that Trevathan had given, which had matured, and which was secured by a chattel mortgage, it alleging that it was the owner of the land which it had purchased.

After the bank failed and the Bank Commissioner took charge, Mr. Trevathan agreed with the bank officials to turn over all his property, including land and personal property, in payment of the debt. This was agreed to by the bank, and the representative of the bank actually took charge of and sold five mules, began arrangements to rent to Mr. Travathan one hundred acres of the land, sold some of the hay, and then Mr. Trevathan changed his mind, and claimed that, because of the foreclosure sale, which he said he did not know about when he first offered to turn his property over to the bank, the bank was indebted to him, becuase the record showed that the land was conveyed to the bank for $27,-000, practically the entire indebtedness. It was, however, agreed by all parties that Mr. Trevathan could not go on with it, could not pay it, and no one claims that all the property, land and personal, was worth as much as the debt. In fact, the undisputed proof shows that Mr. Trevathan, before this time, wanted to turn over all the property in payment of the debt, and the bank declined to accept it.

But Mr. Trevathan testified himself: "After I had the conversation with Mr. Rhodes, I understood I owned the land and owed the debt. I did not know any difference until Mr. Oliver told me. I made the proposition to turn over everything to Mr. Oliver, and changed my mind when I saw no prospects of getting my papers. I had nothing to do with the price put on the mules; Mr. Outzen told me he was getting $85 apiece for them. At

the time I made the agreement to deliver this personal property I did not know that the land had been sold.''

But he did know, according to his own testimony, that he was going on as he usually did, that he did not pay rent, and he knew, according to his conversation with Mr. Rhodes, that he owed the debt and was to own the land. Certainly he did not expect to retain the land without paying the debt.

There is practically no conflict in the testimony, except Mr. Trevathan insists that he did not know that the bank had proceeded with the foreclosure suit, but his agreement would have been the same if he had known it. He was to pay his indebtedness and have the land, and the fact that the consideration shown in the deed was the entire indebtedness and the fact that Mr. Trevathan remained just as he was on the farm without the payment of any rent, and continued to give his mortgages annually as he had before, are all circumstances tending to show that the agreement was made that Trevathan was to pay the debt and then own the land.

The rule is well stated in a note in 42 A. L. R. 82, as follows:

''An examination of the authorities will disclose that many of them simply lay down the general proposition that, where one buys land at a judicial sale under a parol agreement to purchase for another, and fails to convey according to the agreement, a resulting trust arises, where the promisee owned or had any interest in the land, without discussing other equities or other equitable considerations. And while the facts of this case, as we have above pointed out, make it unnecessary to so decide, it would appear to be hardly practicable in all cases to search for further equities, and that it would be enough to say with the Mississippi and California courts, above quoted, that 'the defendant, upon the faith of such an agreement, may have ceased his efforts to raise the money for the purpose of paying off the execution, and thus preventing a sale of his property.' In fact, it could only be for the purpose of saving his property

that such an agreement would be made, and it is but reasonable and natural to suppose that further efforts would be made, did not the particular promisor afford sufficient assurance that he would make the desired purchase, and therefore afford the desired protection.''

And, still quoting from the note:

''In such case it is not the parol contract, but the trust, that is sought to be enforced. If the owners were lulled into security and thereby induced to desist from trying to save their property, and the person agreeing to buy it in acquires it at a grossly inadequate price, then the right of action rests not upon the parol contract, but upon the fiduciary relations and transactions, of which the agreement was a mere attendant.''

Here the bank bid in the property for $27,000, when the foreclosure suit was for only $16,000, and no one contends that the land was worth anything like $27,000. There is no testimony showing what the land is worth, but the appellant, through his son, agreed to rent 100 acres of it at $3 an acre, provided he was permitted to select the 100 acres himself.

Many authorities hold that, where there is a friendly foreclosure with the understanding that the property shall be bid in and held for security for the amount advanced, the purchaser holds in trust for the owner. It is said that this trust is enforceable in some jurisdictions as an express trust, and in others it is called a trust *ex maleficio*. But it is a trust nevertheless, and the bank could have been compelled to restore the property to Trevathan at any time that he paid the debt. And, if it was binding on one party, it would, of course, be binding on the other.

In the instant case there appears to have been a friendly suit, a friendly foreclosure, with the understanding that Mr. Trevathan should own the property when he paid the debt. If the foreclosure was as contended for by appellant, he would be entitled to equitable relief.

The New York court has held:

"In the case cited the defendant had undertaken to purchase certain real estate at a foreclosure sale for the benefit of the owner of the equity of redemption, and had thus acquired the property at a price very much below its true value. Under these circumstances such purchaser was held to be a trustee of the party for whom he promised to act in buying the land, and was compelled to convey it to the party for whom he really acted, upon a tender of the purchase money and interest. I am unable to see why, under the rule thus applied, the respondent in the case at bar is not compellable, upon proof of the facts set out in this amended complaint, to account as trustee to the plaintiffs in the present action." *Wakeman* v. *Somarindyck*, 73 App. Div. 606, 76 N. Y. Sup. 818.

But this court has passed on similar questions numerous times, and, discussing the question quoted from the Missouri court, said:

"There is another class of cases growing out of the conduct of debtors and purchasers at public sales. This is where the purchaser becomes such under a state of facts as would make it a fraud to permit him to hold on to his bargain. As if a purchaser, by means of a promise to reconvey to his debtor, should induce a relaxation of the efforts on his part to prevent a sacrifice of his property, and thereby obtain it at an under price, or, if the purchaser, taking advantage of that reluctance invariably manifested by those attending public sales to interfere with any arrangement a debtor makes to save his property, should create an impression that he was buying for the debtor, thereby preventing competition, or by any other improper means obtain the property of a debtor at a sacrifice, such conduct would convert the purchaser into a trustee for the benefit of those who were defrauded by his conduct. * * * The same rule applies where the promisee relaxed his efforts to save the property from being sold at the judicial sale." *Strasner* v. *Carroll*, 125 Ark. 34, 187 S. W. 1057.

As to the weight of the evidence and the credibility of the witnesses, the finding of a chancellor is never disturbed unless such finding is against the preponderance of the evidence.

We think the chancellor's finding in this case is supported by the preponderance of the evidence, and the decree is therefore affirmed.